**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| REBEKAH LEITNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 6:21-cv-3075 |
| | ) | |
| RICHARD MORSOVILLO, | ) | |
| JEFFREY SNEED, | ) | |
| DAVID ROARK, | ) | **JURY TRIAL DEMANDED** |
| JENNIFER GRIFFIN, | ) | |
| JUMPSIX MARKETING, LLC, and | ) | |
| BIGPXL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR LEGAL AND EQUITABLE RELIEF**

Comes now Plaintiff, Rebekah Leitner, by and through counsel, and states as follows for her Complaint for Legal and Equitable Relief against Defendants Richard Morsovillo, Jeffrey Sneed, David Roark, Jennifer Griffin, JumpSix Marketing, LLC, and BigPxl, LLC:

<u>The Parties</u>

1.       Plaintiff Rebekah Leitner (hereinafter referred to as "Rebekah") is a citizen and resident of Ohio with a business address of 726 East Main Street, Ste. F #256, Lebanon, Ohio 45036.

2.       Defendant Richard Morsovillo (hereinafter referred to as "Morsovillo") is a citizen and resident of Missouri with a place of business located at 1335 E. Bradford Parkway, Springfield, Missouri 65804.

3.       Defendant Jeffrey Sneed (hereinafter referred to as "Sneed") is a citizen and resident of Missouri with a place of business located at 1335 E. Bradford Parkway, Springfield, Missouri 65804.

1

4.     Defendant David Roark (hereinafter referred to as "Roark") is a citizen and resident of Indiana.

5.     Defendant Jennifer Griffin (hereinafter referred to as "Griffin") is a citizen and resident of Indiana.

6.     Defendant JumpSix Marketing, LLC (hereinafter referred to as "JumpSix") is a Missouri limited liability company formed on June 27, 2018 with a place of business located at 1335 E. Bradford Parkway, Springfield, Missouri 65804. JumpSix's registered agent is Heather Rooney McBride and its registered office is at 4905 S. National Avenue, Suite A100, Springfield, Missouri 65804.

7.     Defendant BigPxl, LLC (hereinafter referred to as "BigPxl") is a Missouri limited liability company formed on October 17, 2019 with a place of business located at 1335 E. Bradford Parkway, Springfield, Missouri 65804. BigPxl's registered agent is Heather Rooney McBride and its registered office is at 1445 E. Republic Road, Springfield, Missouri 65804.

<u>Nature of the Action</u>

8.     This is a civil action for Tortious Interference with Plaintiff's Contracts and/or Business Expectations (Count I); Defamation (Count II); Violation of the Stored Wire and Electronic Communication Act ("SECA"), 18 U.S.C. § 2701 *et seq*. (Count III); Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq*. (Count IV); Violation of the Missouri Computer Tampering Act, R.S.Mo. § 537.525 *et seq*. (Count V); Conversion (Count VI); Conspiracy (Count VII); and for an Accounting (Count VIII).

<u>Jurisdiction and Venue</u>

2

9.      This Court has original diversity jurisdiction of the instant matter pursuant to 28 U.S.C. § 1332, for it is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

10.      Plaintiff is a citizen of Ohio.

11.      Defendants Morsovillo and Sneed are Missouri citizens.

12.      Defendants Roark and Griffin are Indiana citizens.

13.      Upon information and belief, Morsovillo and Sneed are the sole owners/members of JumpSix and BigPxl.

14.      Upon information and belief, JumpSix and BigPxl and their respective members are Missouri citizens.

15.      Upon information and belief, no members of JumpSix or BigPxl are citizens of Ohio.

16.      This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Counts III and IV, which are claims arising under federal statutes. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining Counts because they are so closely related to the federal claims as to form part of the same case or controversy.

17.      Defendants Roark and Griffin were and are "independent consultants" of JumpSix and then BigPxl, which are Missouri limited liability companies headquartered in Springfield, Missouri.[1]

18.      Defendants Roark and Griffin physically entered Missouri to attend one or more training sessions hosted by JumpSix in Springfield, Missouri, where some of the tortious acts occurred.

---

[1] See https://bigpxl.com/team/ (last accessed March 9, 2021).

19.     Defendants Roark and Griffin routinely held and continue to hold themselves out to the public as having a Missouri business address of 1335 E. Bradford Parkway, Springfield, Missouri 65804, and have listed and continue to list this Missouri address in the signature blocks of their @bigpxl email addresses.

20.     Defendants Roark and Griffin regularly communicated by emails and telephone calls with JumpSix and BigPxl employees and agents who were physically located in Springfield, Missouri, improperly accessed electronic data of Rebekah and her clients which was stored in Missouri, and otherwise transacted business and committed tortious acts within the State of Missouri.

21.     All Defendants have transacted business and committed tortious acts within the State of Missouri and have significant contacts with the State of Missouri such that this Court has personal jurisdiction over all Defendants.

22.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, in that this Court is a judicial district in which multiple Defendants reside and in which a substantial part of the events or omissions giving rise to the claims occurred, and where a substantial part of the electronic data and property that is in part the subject of this action is situated.

<u>Factual Allegations</u>

23.     In 2012, Rebekah began a marketing business in the Cincinnati, Ohio area. She began with print marketing, and later expanded to sell digital marketing and advertising services as well as websites and website hosting and management.

24.     Rebekah had her own clients, set her own prices for the services to be provided to her clients, and Rebekah's clients paid her directly for all services. Rebekah's contracts with her clients provided for Ohio choice of law and jurisdiction in Ohio Courts.

4

25.     In 2012, Rebekah began doing business with Landon McCarter, who operated various business entities.

26.     In 2014, Rebekah began doing business with Landon McCarter's company Mission Marketplace, LLC (hereinafter referred to as "Mission Marketplace"), which operated under the name "JumpSix Marketing" pursuant to a fictitious name registration filed with the Missouri Secretary of State.

27.     The Mission Marketplace registration expired on January 24, 2019.

28.     When Rebekah did business with Mission Marketplace, she utilized Mission Marketplace to perform marketing services for her clients, such as internet advertising, website design, and website hosting services.

29.     When Rebekah did business with Mission Marketplace, she remained free to set her own prices with her clients.

30.     Sometime in 2014 or 2015, Morsovillo and Sneed became involved with Landon McCarter and Mission Marketplace.

31.     More specifically, Morsovillo and Sneed assisted Landon McCarter and Mission Marketplace by utilizing a call center to generate leads and by assisting with administrative tasks.

32.     In approximately November 2016, Rebekah retained Defendant Roark as an independent contractor sales representative for her business.

33.     In approximately April 2017, Rebekah retained Defendant Griffin as an additional independent contractor sales representative for her business.

34.     On June 27, 2018, Morsovillo caused to be formed a Missouri limited liability company with the name JumpSix Marketing, LLC as well as the following fictitious name registrations with the Missouri Secretary of State:

5

| Name: | Owner: | Filing Date: |
|-------|--------|--------------|
| Jumpsix Marketing | JumpSix Marketing, LLC<br>Rick Morsovillo | 6/27/2018 |
| Jumpsix | JumpSix Marketing, LLC<br>Rick Morsovillo | 6/27/2018 |
| Jump Six | JumpSix Marketing, LLC<br>Rick Morsovillo | 6/29/2018 |
| JumpSix Marketing | JumpSix Marketing<br>Rick Morsovillo | 6/29/2018 |

35.     In early 2019, Morsovillo and Sneed claimed that they had succeeded to or otherwise taken over Landon McCarter's business with an amicable parting.

36.     In fact, the parting between Landon McCarter and Morsovillo and Sneed was not amicable.

37.     In fact, JumpSix is not the legal successor to Landon McCarter and his business.

38.     Upon information and belief, there was no written agreement or assignment or other legal basis, by operation of law or otherwise, for suggesting that Morsovillo and Sneed were successors to Landon McCarter and his business.

39.     Morsovillo and Sneed falsely portrayed themselves as the successors to Landon McCarter's business with the intent of inducing Rebekah to continue with them the business relationship she previously had with Landon McCarter and his business.

40.     Rebekah was unaware of what transpired between Morsovillo and Sneed on the one hand, and Landon McCarter and his business on the other hand.

41.     Due to the false and misleading misrepresentations by Morsovillo and Sneed, Rebekah continued to do business with Morsovillo and Sneed and their new company, and utilized JumpSix to perform marketing services for her clients.

42. In the summer of 2019, Rebekah received a phone call from JumpSix's newly promoted sales manager, Drew Owen, ("Owen") who talked vaguely about some changes coming in the near future.

43. Owen created friction between Rebekah and her sales representatives, Roark and Griffin, by among other things:

   a. Providing conflicting product information.

   b. Unilaterally changing payment terms with one of Rebekah's clients without authority from Rebekah and without informing Rebekah, even though she specifically requested to be kept informed on the contract, thereby undermining Rebekah with her sales representatives and her clients.

   c. Providing incomplete and inaccurate financial information about Rebekah to her sales representatives, causing them to question the financial stability of Rebekah's business and her ability to pay them.

44. In September 2019, Rebekah brought her sales representatives, Roark and Griffin, to Springfield, Missouri for three days of product training by JumpSix.

45. During the Springfield, Missouri training session, Owen, the JumpSix manager, announced that pricing to Rebekah and her colleagues would approximately double beginning in 2020.

46. During the Springfield, Missouri training session, Morsovillo and Sneed proposed putting pictures of Rebekah, Roark, and Griffin on the JumpSix website.

47. Pictures of Rebekah, Roark, and Griffin were in fact posted on JumpSix's website, but Rebekah's picture was later removed.[2]

_____

[2] See https://bigpxl.com/team/ (last accessed March 9, 2021).

48.     One week after the Springfield, Missouri training session, Rebekah traveled back to Springfield from Cincinnati, Ohio to discuss the proposed pricing changes with Morsovillo and Sneed.

49.     At the follow-up meeting with Morsovillo and Sneed in Springfield, Missouri, the following occurred:

    a.      Morsovillo and Sneed told Rebekah to disregard the proposed pricing changes, saying they would be "doing something else" instead.

    b.      Morsovillo and Sneed told Rebekah that the existing pricing would be valid through the end of the year, that the new pricing would continue to be competitive, and that they would provide specific documentation on the new pricing soon.

    c.      Rebekah showed Morsovillo and Sneed her business/growth plan, and Morsovillo and Sneed stated that they were impressed by her sales representatives.

    d.      Morsovillo and Sneed pointedly asked Rebekah if Roark and Griffin had non-compete agreements, which could impact or limit the ability of Roark and Griffin to work for JumpSix and/or Bix Pxl and compete with Rebekah.

    e.      Morsovillo and Sneed asked Rebekah to prepare a document setting forth changes she would like to see, and said they would do what they could to keep Rebekah happy.

50.     In September and October of 2019, Rebekah began submitting proposals to Morsovillo and Sneed for improving their business relationship. Sneed did not respond and kept saying he needed more time.

51.     In a telephone call on November 8, 2019, Rebekah spent 30-40 minutes telling Sneed about her recommendations and presenting her proposed growth plan. Instead, Sneed told

Rebekah that the true purpose of the call was to inform Rebekah that Roark and Griffin were terminating their relationship with Rebekah and that JumpSix was hiring Roark and Griffin away from her.

52.     In the same November 8, 2019 telephone call, Sneed proposed a "buy out commission" of sorts and asked Rebekah to allow her clients to transfer their relationships to Roark and Griffin and JumpSix and BigPxl instead of continuing their relationships with Rebekah.

53.     In a November 14, 2019 telephone call, Rebekah told Sneed that she wanted a "clean break" between her former sales representative and her clients, and requested each of the following:

    a.     For Roark's and Griffin's access to Rebekah's clients, including Rebekah's electronic files and data and her clients' electronic files and data, to be cut off and eliminated.

    b.     For Roark's and Griffin's email accounts (for which Rebekah paid $5 per month per account and which Sneed acknowledged Rebekah owned) be locked and forwarded to Rebekah.

    c.     For Roark and Griffin to have no access to Rebekah's prospects and clients or their data and files moving forward, including electronic data linked to the email accounts on the HubSpot client relationship management platform, Google Drive, and the Basecamp project management platform.

    d.     For all of Roark and Griffin's access to be revoked and eliminated before they were notified of the "clean break" between them and Rebekah's clients and data.

    e.     For Sneed to provide Rebekah with a list of her clients for which JumpSix provided services as of that particular time.

54.     Sneed electronically confirmed Rebekah's client list while on the November 14, 2019 telephone call, and further agreed that JumpSix would perform each of the aforementioned items Rebekah requested during the November 14, 2019 telephone call.

55.     Despite Sneed's agreement, Sneed and JumpSix told Roark and Griffin that Rebekah had decided to cut off their access to her clients' data and files very shortly after the November 14, 2019 telephone call and before their access was altered.

56.     Despite Sneed's agreement, JumpSix never cut off and eliminated the access of Roark and Griffin to Rebekah's clients, Rebekah's data and files, the data and files of Rebekah's clients, or to Roark and Griffin's email accounts.

57.     Instead, JumpSix, Sneed, and Morsovillo allowed Roark and Griffin to tamper with the data and files of Rebekah and her clients and actively encouraged Roark and Griffin to do so by providing them information about Rebekah's clients for the purpose of having Roark and Griffin contact them and pressure them to do business with JumpSix and BigPxl instead of with Rebekah.

58.     Roark and Griffin tampered with the data and files of Rebekah and her clients with the knowledge that Rebekah had instructed JumpSix to eliminate their access and with the knowledge that they were not authorized to do so.

59.     Sneed eventually told Rebekah it was "too much of a hassle" to set up new email accounts for Roark and Griffin, even though their relationship at that time was with JumpSix and/or BigPxl and no longer with Rebekah.

60.     In the course of these discussions, Sneed acknowledged several times that the clients were Rebekah's property, that the client contracts were with Rebekah and not with JumpSix, and that Rebekah could do what she wanted with her clients.

61.     For the following reasons, Rebekah did not pay JumpSix's November and December 2019 invoices for services to her clients:

a.     JumpSix, Sneed, and Morsovillo had hired away her sales representatives Roark and Griffin.

b.     JumpSix, Sneed, and Morsovillo continued to allow Roark and Griffin to access Rebekah's clients, data, and files as well as the data and files of Rebekah's clients, even after Rebekah had demanded that such access be eliminated.

c.     JumpSix, Sneed, and Morsovillo informed Roark and Griffin that Rebekah had instructed JumpSix to eliminate their access before taking any steps to do so, thereby allowing Roark and Griffin an opportunity to access and tamper with Rebekah's data with the knowledge that they were not authorized to do so and with the anticipation that their access might be curtailed in the future.

d.     JumpSix, Sneed, and Morsovillo began denying Rebekah access to her own data.

e.     JumpSix, Sneed, and Morsovillo began denying Rebekah access to her new pending client information and data and transferring such data to the accounts of Roark and Griffin, her former sales representatives, which Rebekah could no longer access.

f.     Both invoices contained discrepancies regarding the actual work performed.

g.     In the invoices, JumpSix attempted to accelerate billing for work that had not yet been performed, contrary to the verbal agreement and past practices.

h.     Rebekah became aware that Morsovillo and Sneed may be planning to dissolve JumpSix or otherwise significantly alter the business model in the near future.

i.     Rebekah had until December 31, 2019 to pay the November invoice before it could be considered delinquent, which would have given Rebekah and her clients some time to form a transition plan for their business needs.

j.     Rebekah was coming to trust Morsovillo and Sneed less and less.

62.    Rebekah did offer to pay JumpSix's November and December 2019 invoices if and when all discrepancies had been addressed and resolved and she was able to make a clean break from JumpSix with all of her clients.

63.    The JumpSix invoices were sent on the first of each month and outlined what work was expected to be delivered by the end of that month.

64.    Payment for services provided by JumpSix was due after the services were completed.

65.    The invoice due date was applicable to services fully and actually completed during the month of the invoice.

66.    If a line item on a JumpSix invoice was not delivered as expected, it would be moved to the future invoice for the month when the work was actually completed.

67.    As a result, JumpSix invoices were frequently revised after they were sent, but before the true amount due was finalized and payment was authorized.

68.    When Rebekah worked with Landon McCarter and his business, the payment terms were such that payments were due within 30 days of the invoice date and did not become delinquent until 30 days after the due date. This meant that an invoice dated November 1 was due on December 1 and did not become delinquent until December 31.

69.     The payment terms Rebekah had with Landon McCarter and his business continued on with JumpSix, and payments were due within 30 days of the invoice date and did not become delinquent until 30 days after the due date.

70.     Despite the existing payment terms and past and current practice, on December 13, 2019 JumpSix emailed many of Rebekah's clients falsely stating that her payments to JumpSix were delinquent and that many services were immediately being halted due to non-payment. This caused immediate damage and financial loss to Rebekah and many of her clients.

71.     On December 16, 2019, JumpSix emailed all of Rebekah's clients making the same false claims that her payments to JumpSix were delinquent and that services were being halted due to non-payment.

72.     JumpSix's emails to Rebekah's clients acknowledged that Rebekah was the controlling party under the client contracts, but also copied her former sales representatives Roark and Griffin on the communications.

73.     In many cases, JumpSix expressly redirected Rebekah's clients to contact Roark and Griffin, Rebekah's former sales representatives now working for JumpSix and/or BigPxl, if they needed assistance, instead of telling them to contact Rebekah.

74.     Roark and Griffin, in turn, sent messages using their JumpSix and BigPxl email accounts to some of Rebekah's clients, threatening to terminate the hosting of their websites unless they signed new contracts with JumpSix and BigPxl and/or paid JumpSix and BigPxl for the amounts allegedly owed by Rebekah, and sometimes for additional amounts.

75.     JumpSix maintained a client relationship management ("CRM") platform, known as HubSpot, where Rebekah was invited to store her data and communications with prospective clients and leads she purchased at her expense.

76.     JumpSix maintained a project management platform, known as Basecamp, where Rebekah was invited to store her data about her active clients and actively pending clients.

77.     Rebekah maintained a Google Drive account where she stored confidential documents and data related to her business growth plans, marketing plans, and training guides she developed.

78.     Rebekah allowed her sales representatives to access some of the Google Drive files for their use solely while they were acting as Rebekah's sales representatives, by allowing them to access certain of the files in Google Drive accounts linked to their email accounts.

79.     Rebekah's Google Drive account and files were solely to be accessed and used by Rebekah and her sales representatives for the benefit of Rebekah's business, and access to the Google Drive account and files was linked to the email accounts of Rebekah, Roark, and Griffin.

80.     In December 2019, JumpSix removed Rebekah's access to her leads and clients via JumpSix's HubSpot and Basecamp and email systems, while keeping JumpSix and Rebekah's former sales representatives fully connected and engaged through all channels, despite Rebekah's prior directive that the former sales representatives be cut off from such access.

81.     In December 2019, JumpSix removed Rebekah's access to her confidential business documents and data stored in her Google Drive account, while allowing JumpSix and Rebekah's former sales representatives to have access to the Google Drive files, despite Rebekah's prior directive that the former sales representatives be cut off from such access.

82.     During December 2019, JumpSix took the following actions, among others:

a.     Changed the password to Rebekah's JumpSix email account, thereby locking her out and denying her access to the email account she used to communicate with clients and prospects.

b.      Removed Rebekah's access to the Basecamp project management platform, thereby locking her out and denying her access to information and data about her clients.

c.      Removed Rebekah's access to her Google Drive account, thereby locking her out and denying her access to her confidential business information and data and preventing Rebekah from removing the access of Roark and Griffin to the Google Drive files.

d.      Removed Rebekah's access to the HubSpot client management platform, thereby locking her out and denying her access to information and data about her leads, and transferred data concerning pending leads maintained for Rebekah to Roark and Griffin, while denying Rebekah's access to such information.

e.      Prevented Rebekah from contacting her clients through JumpSix's system.

f.      By changing passwords, locked some of Rebekah's clients out of their websites and Google advertising accounts.

g.      JumpSix started contacting Rebekah's clients and pressuring them to enter into contracts with Morsovillo and Sneed's new company, BigPxl.

h.      JumpSix failed to complete certain websites for some of Rebekah's clients, which she had already paid for, and JumpSix kept such payments without completing the agreed upon work.

83.      In a November 25, 2019 telephone call with Morsovillo, and on a follow up email on December 2, 2019, Rebekah learned that JumpSix was to be dissolved as of December 31, 2019 and replaced by BigPxl on January 1, 2020.

84.      Additionally, Rebekah learned that the business model would be altered as follows:

a.      Independent dealers like Rebekah would be eliminated.

15

b.      The former independent dealers would instead become sales agents of BigPxl with no real business of their own, and would be forced to sign a client "referral agreement" with BigPxl.

c.      The former independent dealers would receive commissions which would, effectively, be approximately 50% of the margin they previously generated with their customers.

d.      BigPxl would own, bill, and be paid by clients directly.

e.      BigPxl would own all aspects of the business.

85.     Rebekah had no interest in any relationship with BigPxl and sought to preserve her business despite JumpSix hiring away her sales representatives, disrupting her business, cutting off her access to her client files and data, defaming her to her own clients and prospects, and stealing her clients.

86.     The wrongful acts of the Defendants include at least the following:

a.      Falsely portraying Morsovillo and Sneed as successors to Landon McCarter's business.

b.      Hiring Rebekah's sales representatives and using their knowledge about their business and clients to steal her clients.

c.      Falsely claiming that Rebekah was delinquent in payments to JumpSix and telling her clients that services to them were being halted as a result unless they entered into agreements with JumpSix and/or BigPxl.

d.      Actually interrupting and withholding services to Rebekah's clients until they terminated their relationships with Rebekah, or paid directly to JumpSix the amount

JumpSix claimed was owed by Rebekah, or entered into separate agreements with JumpSix and/or BigPxl.

e. Using Rebekah's client data and information about her clients obtained from her former sales representatives to solicit her clients to sign contracts with JumpSix and BigPxl.

f. Withholding and interrupting services and access to the digital property of Rebekah's clients, including disabling and denying access to their advertising accounts and websites, refusing requests to transfer data, and denying overall control of their websites, to pressure Rebekah's clients to sign contracts with BigPxl.

g. Eliminating Rebekah's access to her email account and information and data about her clients and prospects on the Basecamp and HubSpot platforms, while simultaneously refusing to honor Rebekah's instruction to terminate her former sales representatives' access to the same and preventing Rebekah from removing Roark and Griffin's access to the same.

h. Eliminating Rebekah's access to her Google Drive account and information and data about her business, while simultaneously refusing to honor Rebekah's instruction to terminate her former sales representatives' access to the same and preventing Rebekah from removing Roark and Griffin's access to the same.

87. As a direct result of the actions of Defendants, Rebekah was damaged as follows:

a. Rebekah's sales declined from over $70,000 in October 2019 to $8,725 in January 2020.

b. Rebekah lost existing business and suffered substantial lost revenues in excess of $400,000.

c.    Rebekah's business, which had experienced 35-40% growth for the previous three years, lost the opportunity for the further growth she told Morsovillo and Sneed about when she met with them in September 2019.

d.    The growth of Rebekah's business, client renewals, and new business proposals were adversely affected, with estimated lost revenues in excess of $250,000.

88.    To date, JumpSix has not been dissolved.

89.    Morsovillo and Sneed retain control of the assets and operations of BigPxl such that they dominate the operations of BigPxl.

90.    BigPxl operated out of the same office space occupied by JumpSix.

91.    Upon information and belief, JumpSix shared, transferred, or gratuitously gave to BigPxl, *inter alia*, their facilities, accounts, customer lists, employees, general business operations and office equipment, office location, telephone numbers, mailing address, facsimile numbers, phone book listings, email addresses, website, trade group memberships, records, computers, intellectual property rights, logo, letterhead, business cards, uniforms, signage, and goodwill, such that there is no independence between the operations of JumpSix and BigPxl

92.    BigPxl is the mere continuation or alter ego of JumpSix.

93.    All of the aforementioned acts of Defendants were performed for the purpose of benefiting and enriching BigPxl and did in fact benefit BigPxl at the expense of and to the detriment of Rebekah and her clients.

94.    Morsovillo's actions are part of a continuing pattern and practice of deceptive business practices consistent with a federal mail fraud Plea Agreement Morsovillo entered into in his capacity as President of Dataline Technologies, Inc. (hereinafter referred to as "Dataline") in

the case of <u>United States of America v. Dataline Technologies, Inc.</u>, United State District Court for the Western District of Missouri, Southern District, Case No. 14-03099-CR-5-GAF.

95.     As part of the Plea Agreement, Dataline paid $398,000 in restitution to hundreds of victims who were induced to purchase ink cartridges through false representations and promises by Dataline.[3]

96.     Upon information and belief, the conduct Dataline pleaded guilty to was conducted out of the same premises currently occupied by Morsovillo, Sneed, JumpSix, and BigPxl at 1335 E. Bradford Parkway, Springfield, Missouri.

97.     Additionally, Morsovillo has also been the subject of at least one enforcement action brought by the Missouri Attorney General for deceptive business practices.[4]

98.     During the course of their dealings with Rebekah, Defendants had access to electronic information, data, emails, contact lists, and files concerning Rebekah's clients, prospects, pricing, and business growth and development plans, which were stored on JumpSix's computer systems for the sole limited purpose of furthering Rebekah's business interests by providing services to Rebekah's clients and prospects at Rebekah's request.

99.     Defendants never had authorization to access Rebekah's information and data to act in furtherance of their own business interests.

100.    Defendants never had authorization to access Rebekah's information and data in any manner or for any purpose upon termination of their relationship with Rebekah.

---

[3] Department of Justice Press Release (Dec. 3, 2015), available at: https://www.justice.gov/usao-wdmo/pr/us-attorneys-office-collects-over-255-million-criminal-civil-actions-2015 (last accessed February 22, 2021).

[4] David Segal, *The Names Change, but the Complaints Don't*, N.Y. Times (March 26, 2011), available at: https://www.nytimes.com/2011/03/27/your-money/27haggler.html (last accessed February 22, 2021).

101. When Defendants decided to act out of their own interests, instead of Rebekah's interests, their authority to access Rebekah's information and data was voided because the only basis of their authority had been their relationship with Rebekah.

102. Defendants accessed Rebekah's information and data without authorization or exceeded and abused their former authorization and used such materials for their own purposes to harm and compete with Rebekah and her business.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACTS
## AND/OR BUSINESS EXPECTATIONS

103. Plaintiff incorporates by reference Paragraphs 1 through 102 into this Count I of Plaintiff's Complaint.

104. Rebekah had valid business relationships with her customers, prospects, and sales representatives, including existing contracts with customers and valid expectancies of future relationships and contracts with customers.

105. All Defendants had knowledge of Rebekah's contracts, business relationships, future growth plans, and current and future prospects.

106. JumpSix, BigPxl, Morsovillo, and Sneed intentionally interfered with Plaintiff's contracts and business relationships by actively soliciting and encouraging Rebekah's sales representatives to terminate their relationship with Rebekah and come to work for JumpSix and BigPxl.

107. All Defendants intentionally interfered with Plaintiff's contracts and business relationships by, *inter alia*, soliciting, pressuring, and stealing Rebekah's clients, falsely claiming to Rebekah's clients that her payments to JumpSix were delinquent and that services would be halted due to non-payment, encouraging Rebekah's clients to do business with JumpSix and/or

BigPxl instead of with Rebekah, disparaging Rebekah to her current and prospective clients, and misappropriating and using the electronic data, property, and information of Rebekah's clients and of Rebekah to compete with and otherwise harm Rebekah.

108.    Defendants' actions were without justification because they used improper means to further only their own interests.

109.    Plaintiff has suffered and will suffer severe economic harm as a result of the improper and unlawful acts of Defendants as well as other intangible consequences of Defendants' conduct, including reassembling data and information Defendants have tortiously taken and converted, re-establishing customer and sales representative relationships and goodwill, and generally rebuilding her business.

110.    The actions of all Defendants constitute knowing, willful and malicious tortious interference with Rebekah's clients, contracts and business expectations and Defendants have acted with an evil motive and/or reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count I in favor of Plaintiff and against all Defendants, award actual and punitive damages in excess of $75,000, award Plaintiff her court costs incurred, and grant whatever other relief the Court finds appropriate.

**COUNT II**
**DEFAMATION**

111.    Plaintiff incorporates by reference Paragraphs 1 through 110 into this Count II of Plaintiff's Complaint.

112.    On at least December 13, 2019 and December 16, 2019, all Defendants, either individually or through their agents, intentionally published false and defamatory written and oral statements of fact to Rebekah's clients, stating falsely that Rebekah was delinquent in her

payments and other obligations to JumpSix, that Defendants had the right or authority to restrict the clients' access to their own websites or other data, and that Rebekah's former sales representatives were still acting as agents of Rebekah.

113. In November and December 2019, Defendants Roark and Griffin intentionally published false and defamatory written and oral statements of fact to Rebekah's clients, stating falsely that Roark and Griffin were continuing to act on Rebekah's behalf, would continue to work with Rebekah's clients on Rebekah's behalf, remained affiliated with and authorized by Rebekah to work with her clients, and that Roark and Griffin worked for Rebekah's "corporate office."

114. On April 29, 2020, Defendant Roark intentionally published a false and defamatory written statement to one of Rebekah's clients when he stated of Rebekah that "[s]he is a thief and it makes me sick."

115. Further evidence of written false statements of fact made by Defendants about Rebekah is uniquely in the possession of Defendants, and Plaintiff anticipates that discovery will reveal additional dates and instances of defamatory conduct by Defendants.

116. The above described statements of Defendants were intended to, and did, damage Plaintiff's professional and business reputation, cause Plaintiff significant pecuniary harm, and constitute defamation per se. Plaintiff suffered actual harm to her reputation and business as a result of the defamatory statements of Defendants as part of their scheme to steal her clients.

117. Defendants have not retracted their false statements of fact about Rebekah and her business.

118. The statements of Defendants were made intentionally and with malice, knowing that the statements were false or with reckless disregard for their falsity. Therefore, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count II in favor of Plaintiff and against all Defendants, award actual and punitive damages in excess of $75,000, award Plaintiff her court costs incurred, and grant whatever other relief the Court finds appropriate.

**COUNT III**
**STORED WIRE AND ELECTRONIC COMMUNICATIONS ACT**
**18 U.S.C. § 2701 *ET SEQ.***

119.    Plaintiff incorporates by reference Paragraphs 1 through 118 into this Count III of Plaintiff's Complaint.

120.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they accessed Rebekah's email account and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing her email account and, on information and belief, accessed and used the data contained in Rebekah's email account to the detriment of Rebekah and her business and that of Rebekah's clients.

121.    Defendants Roark and Griffin intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they accessed their former email accounts after they knew that Rebekah revoked their access and, on information and belief, accessed and used the data contained in their former email accounts to the detriment of Rebekah and her business and that of Rebekah's clients.

122.    Before Rebekah's access to the HubSpot platform was unlawfully terminated, she and Roark and Griffin routinely utilized HubSpot to communicate electronically with Rebekah's

prospective clients and leads. Rebekah could also view on HubSpot the communications her sales representatives had about Rebekah's leads.

123.    The HubSpot platform is a facility through which an electronic communications service is provided.

124.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they accessed Rebekah's HubSpot login credentials and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing the CRM platform and, on information and belief, accessed and used Rebekah's data contained in the CRM platform, including stored electronic communications, to the detriment of Rebekah and her business and that of Rebekah's prospective clients.

125.    Defendants Roark and Griffin intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they continued to access Rebekah's HubSpot account and data, including stored electronic communications, after they knew that Rebekah revoked their access and, on information and belief, accessed and used such data and communications to the detriment of Rebekah and her business and that of Rebekah's prospective clients.

126.    Before Rebekah's access to the Basecamp platform was unlawfully terminated, she and Defendants routinely utilized Basecamp to communicate with each other electronically about her clients. Rebekah could also view on Basecamp the communications her sales representatives had about Rebekah's clients.

127.    The Basecamp platform is a facility through which an electronic communications service is provided.

128.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they accessed Rebekah's Basecamp login credentials and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing the project management platform and, on information and belief, accessed and used Rebekah's data contained in the project management platform, including stored electronic communications, to the detriment of Rebekah and her business and that of Rebekah's clients.

129.    Defendants Roark and Griffin intentionally accessed stored communications and a facility through which an electronic communications service is provided without authorization or intentionally exceeded their authorized access when they continued to access Rebekah's Basecamp account and data, including stored electronic communications, after they knew that Rebekah revoked their access and, on information and belief, accessed and used such data and communications to the detriment of Rebekah and her business and that of Rebekah's clients.

130.    The emails, HubSpot communications, and Basecamp communications accessed by Defendants which had been sent or read by Rebekah were stored by Rebekah on multiple devices, including a laptop computer, a desktop computer using Apple's "Mail" application, and two cellular phones.

131.    Additionally, some of the emails, HubSpot communications, and Basecamp communications accessed by Defendants were unread by Rebekah at the time they were accessed

by Defendants, especially after her login credentials were altered and changed to prevent Rebekah from accessing her emails, HubSpot, and Basecamp data.

132.     Defendants' actions were in violation of the SECA, 18 U.S.C. § 2701 *et seq*.

133.     As a consequence of such wrongful activities, Rebekah has suffered and will continue to suffer actual damages in the form of substantial pecuniary losses as well as costs associated with reacquiring or recreating some of the stored communications.

134.     The aforesaid acts of all Defendants were without just cause or excuse, intentional and with knowledge that they were wrongful. Defendants have acted with an evil motive and/or reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages against all Defendants.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count III in favor of Plaintiff and against all Defendants for a temporary, preliminary, and permanent injunction requiring Defendants to: return, not retain and not make any use of information unlawfully obtained from Plaintiff, provide Plaintiff's former clients with a copy of the Court's injunction, grant Plaintiff's former clients controlling access to their websites, allow Plaintiff's former clients to cancel or rescind their current contracts with Defendants without penalty or fees, order Defendants to maintain and preserve all computerized or other electronically stored information on their business and home computers, and for an accounting of all monies and profits realized by Defendants as a result of the conduct alleged herein; award actual, statutory, and punitive damages in excess of $75,000; award Plaintiff any profits made by Defendants as a result of their violations of the SECA; award Plaintiff her attorneys' fees and court costs incurred; and grant whatever other relief the Court finds appropriate.

## COUNT IV
## COMPUTER FRAUD AND ABUSE ACT

26

**18 U.S.C. § 1030 *ET SEQ.***

135.    Plaintiff incorporates Paragraphs 1 through 134 into this Count IV of Plaintiff's Complaint.

136.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed intentionally accessed one or more protected computers without authorization or by exceeding their authorized access when they obtained and changed Rebekah's passwords or otherwise deleted or altered her login credentials so as to remove her access to her email account, the HubSpot CRM platform, the Basecamp project management platform, her Google Drive account, and the files and websites and other data of Rebekah's clients. This conduct resulted in an interruption of service to Rebekah and to Rebekah's clients.

137.    Defendants Roark and Griffin intentionally accessed one or more protected computers without authorization or by exceeding their authorized access when they accessed their emails accounts (paid for by Rebekah), Rebekah's client data on the Basecamp project management platform, Rebekah's prospect data on the HubSpot CRM platform, Rebekah's confidential business information on Google Drive, and the files and websites and other data of Rebekah's clients, after Rebekah expressly demanded that they no longer do so and that their access be terminated. Roark and Griffin unlawfully accessed and copied or downloaded or otherwise used Rebekah's confidential client information for their own personal use or for the use of their new principal, JumpSix and/or BigPxl.

138.    Defendants JumpSix and BigPxl are directly liable and/or vicariously liable for the acts of Morsovillo, Sneed, Roark, and Griffin and also are directly liable for disregarding Rebekah's instruction that the access of Roark and Griffin be terminated.

139.    The aforesaid acts were without authorization or exceeded the authorization previously provided by Rebekah.

140.    By means of the aforesaid conduct, Defendants furthered their intended fraud of stealing Rebekah's clients and undermining Rebekah's business relationships under the pretense that Rebekah was delinquent in her obligations to JumpSix and obtained valuable client and prospect contacts, data, websites, and passwords.

141.    Additionally, all Defendants conspired with one another to commit the above acts in furtherance of their scheme to steal Rebekah's confidential client and prospect information, impair the ability of Rebekah's clients to access their own data and websites, and pressure Rebekah's clients to cease their relationships with Rebekah and work with JumpSix and BigPxl instead.

142.    The aforesaid acts of Defendants caused loss and damage to Rebekah of at least $5,000 in a one-year period, including the cost of attempting to restore and/or recreate the stolen client correspondence, files, data, websites, business information, and projects, and significant lost revenue as a result of the Defendants' actions. Such loss was a result of an interruption in service when Defendants retained Rebekah's property, refused to provide Rebekah access to her client correspondence, prospect files, data and business information, and allowed her former sales representatives to access such information despite Rebekah's clear instruction that their access be revoked.

143.    All Defendants have violated the CFAA, and Plaintiff is entitled to damages thereunder.

144.    The aforesaid acts of all Defendants were without just cause or excuse, intentional and with knowledge that they were wrongful. Defendants have acted with an evil motive and/or

reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages against all Defendants.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count IV in favor of Plaintiff and against all Defendants for a temporary, preliminary, and permanent injunction requiring Defendants to: return, not retain and not make any use of information unlawfully obtained from Plaintiff, provide Plaintiff's former clients with a copy of the Court's injunction, grant Plaintiff's former clients controlling access to their websites, allow Plaintiff's former clients to cancel or rescind their current contracts with Defendants without penalty or fees, order Defendants to maintain and preserve all computerized or other electronically stored information on their business and home computers, and for an accounting of all monies and profits realized by Defendants as a result of the conduct alleged herein; award actual and punitive damages in excess of $75,000; award Plaintiff her court costs incurred; and grant whatever other relief the Court finds appropriate.

## COUNT V
## MISSOURI COMPUTER TAMPERING ACT
## R.S.MO. § 569.095 *ET SEQ.*

145.    Plaintiff incorporates Paragraphs 1 through 144 into this Court V of Plaintiff's Complaint.

146.    Rebekah owned her email account and the email accounts of Roark and Griffin.

147.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's email account and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing her email account

and, on information and belief, accessed and used the data contained in Rebekah's email account to the detriment of Rebekah and her business and that of Rebekah's clients.

148.    Defendants Roark and Griffin knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed their former email accounts after they knew that Rebekah revoked their access and, on information and belief, accessed and used the data contained in their former email accounts to the detriment of Rebekah and her business and that of Rebekah's clients.

149.    Rebekah owned her Google Drive account and the confidential business documents, data, and information stored therein.

150.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's Google Drive account and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing her Google Drive account and, on information and belief, accessed and used the data contained in Rebekah's Google Drive account to the detriment of Rebekah and her business and that of Rebekah's clients.

151.    Defendants Roark and Griffin knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's Google Drive documents and information after they knew that Rebekah revoked their access and knew that Rebekah had been locked out and, on information and belief, accessed and used the data contained in the Google Drive account to the detriment of Rebekah and her business and that of Rebekah's clients.

152.    Rebekah owned the client data and information contained on the Basecamp project management platform and related to her clients and their projects.

153.     Defendants JumpSix, BigPxl, Morsovillo, and Sneed knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's Basecamp login credentials and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing the project management platform and, on information and belief, accessed and used Rebekah's data contained in the project management platform to the detriment of Rebekah and her business and that of Rebekah's clients.

154.     Defendants Roark and Griffin knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's data contained in the Basecamp project management platform after they knew that Rebekah revoked their access and, on information and belief, accessed and used Rebekah's data contained in the Basecamp project management platform to the detriment of Rebekah and her business and that of Rebekah's clients.

155.     Rebekah owned the prospect and lead data and information contained on the HubSpot CRM platform.

156.     Defendants JumpSix, BigPxl, Morsovillo, and Sneed knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's HubSpot login credentials and damaged, took, and changed her password or otherwise damaged and/or altered Rebekah's login credentials so as to prevent her from accessing the CRM platform and, on information and belief, accessed and used Rebekah's data contained in the CRM platform to the detriment of Rebekah and her business.

157.     Defendants Roark and Griffin knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed Rebekah's data contained

in the HubSpot CRM platform after they knew that Rebekah revoked their access and, on information and belief, accessed and used Rebekah's data contained in the CRM platform to the detriment of Rebekah and her business.

158.    As between Rebekah and Defendants, Rebekah owned the files and websites and other data of Rebekah's clients, and she only provided such information to Defendants for the sole, limited purpose of furthering Rebekah's business interests by providing certain services as requested and for the benefit of her clients.

159.    Defendants JumpSix, BigPxl, Morsovillo, and Sneed knowingly and without authorization or without reasonable grounds to believe that they had such authorization accessed the files and websites and other data of Rebekah's clients, which Defendants had access to solely for the purpose of providing services to Rebekah's clients, and damaged, took, and changed the password or otherwise damaged and/or altered the login credentials so as to take offline and/or prevent Rebekah's clients from accessing their files and websites and other data and used their files and websites and other data to the detriment of Rebekah and her business and that of Rebekah's clients.

160.    At all times Rebekah was an authorized user of the aforementioned computer system services and data.

161.    Defendants JumpSix and BigPxl are directly liable and/or vicariously liable for the acts of Morsovillo, Sneed, Roark, and Griffin.

162.    By means of the aforesaid conduct, Defendants furthered their intended fraud of stealing Rebekah's clients and undermining Rebekah's business relationships under the pretense that Rebekah was delinquent in her obligations to JumpSix and obtained valuable client and prospect contacts, data, websites, and passwords.

163.     Defendants violated the Missouri Computer Tampering Act, R.S.Mo. § 569.095 *et seq.* by using stored computer information, files and data concerning Rebekah's clients, prospects, and Rebekah's business information and growth plans for their own purposes well beyond their authorized use, while denying Rebekah access to such materials and after Rebekah demanded that they cease using such materials.

164.     As a consequence of such wrongful activities, Rebekah has suffered and will continue to suffer substantial pecuniary loss in the form of actual damages.

165.     The aforesaid acts of all Defendants were without just cause or excuse, intentional and with knowledge that they were wrongful. Defendants have acted with an evil motive and/or reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages against all Defendants.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count V in favor of Plaintiff and against all Defendants, award actual and punitive damages, attorneys' fees, Court costs incurred, and grant whatever other relief the Court finds appropriate.

## COUNT VI
## CONVERSION

166.     Plaintiff incorporates by reference Paragraphs 1 through 165 into this Count VI of Plaintiff's Complaint.

167.     Rebekah is the owner of all information concerning her business, including client and prospect lists, client records, client data and files, her email account, her Google Drive account and the business information stored therein, and the email accounts of her former sales representatives.

168.     Defendants knowingly and intentionally interfered with Rebekah's dominion, use, possession and ownership of her property by misappropriating and using such information to their own use even after Rebekah demanded they cease all use of such information.

169.     Defendants have not returned such information and have converted it to their own possession for their own wrongful purposes without Rebekah's authorization or consent.

170.     Defendants' use of such information and property was without just cause or excuse, intentional and with knowledge that it was wrongful. Defendants have acted with an evil motive and/or reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count VI in favor of Plaintiff and against all Defendants, award actual and punitive damages in excess of $75,000, award Plaintiff her court costs incurred,   and grant whatever other relief the Court finds appropriate.

## COUNT VII
## CIVIL CONSPIRACY

171.     Plaintiff incorporates by reference Paragraphs 1 through 170 into this Count VII of Plaintiff's Complaint.

172.     Defendants had a meeting of the minds and formed an agreement to knowingly, willingly and maliciously steal Rebekah's clients, access and use her client data and files and business information without authorization, deny Rebekah's access to her client data and files and business information, and disrupt her business.

173.     Defendants undertook multiple improper and unlawful overt acts, including but not limited to the following, in furtherance of their conspiracy:

a. JumpSix, Morsovillo, and Sneed falsely portrayed Morsovillo and Sneed as successors to Landon McCarter's business.

b. JumpSix, BigPxl, Morsovillo, and Sneed induced Rebekah to disclose her business/growth plan

c. JumpSix, BigPxl, Morsovillo, and Sneed caused Rebekah's sales representatives to terminate their relationship with Rebekah and come to work for JumpSix and/or BigPxl.

d. JumpSix, BigPxl, Morsovillo, Sneed, Roark, and Griffin improperly used the knowledge and data of Rebekah's former sales representatives to solicit, pressure, and steal Rebekah's clients and to defame Rebekah.

e. JumpSix, BigPxl, Morsovillo, and Sneed withheld services and access to client websites to pressure Rebekah's clients to sign contracts with BigPxl.

f. JumpSix, BigPxl, Morsovillo, and Sneed removed Rebekah's access to her email account and information and data about her clients and prospects and business plans and operations, while simultaneously refusing to honor Rebekah's instruction to terminate her former sales representatives' access to the same.

g. Roark and Griffin continued to access and use Rebekah's electronic information and data about her clients and prospects and business plans with knowledge that Rebekah had ordered that their access be terminated.

174. Plaintiff was damaged as a result of the improper and unlawful acts of Defendants.

175. The actions of Defendants were done knowingly, willingly and maliciously, with the intent to damage Plaintiff and with an evil motive and/or reckless indifference to Plaintiff's rights. Therefore, Plaintiff is entitled to an award of punitive damages.

WHEREFORE, Plaintiff requests this Court enter judgment on this Count VII in favor of Plaintiff and against all Defendants, award actual and punitive damages in excess of $75,000, award Plaintiff her court costs incurred, and grant whatever other and further relief the Court finds appropriate.

## COUNT VIII
## ACTION FOR AN ACCOUNTING

176.    Plaintiff incorporates by reference Paragraphs 1 through 175 into this Count VIII of Plaintiff's Complaint.

177.    Plaintiff requires discovery into the accounts of Defendants JumpSix and BigPxl to determine the amount of damages to Plaintiff caused by such Defendants from their stealing Plaintiff's clients, which damages are ongoing and continuing to accrue.

178.    The account records are in the exclusive control of Defendants JumpSix and BigPxl.

179.    Additionally, Defendants JumpSix and BigPxl continue to withhold electronic data, including controlling access to certain websites, from Rebekah and her clients. The records for these accounts are also in the exclusive control of Defendants JumpSix and BigPxl.

180.    Plaintiff has no legal remedy absent an accounting for determining the amount of funds and data wrongfully directed by Defendants JumpSix and BigPxl from Plaintiff's clients.

WHEREFORE, Plaintiff requests this Court enter an order on this Count VIII in favor of Plaintiff and against Defendants JumpSix and BigPxl for an equitable accounting of all revenues received from Plaintiff's clients and for a temporary, preliminary, and permanent injunction requiring Defendants to: return, not retain and not make any use of information unlawfully obtained from Plaintiff, provide Plaintiff's former clients with a copy of the Court's injunction, grant Plaintiff's former clients controlling access to their websites, allow Plaintiff's former clients

to cancel or rescind their current contracts with Defendants without penalty or fees, order
Defendants to maintain and preserve all computerized or other electronically stored information
on their business and home computers, and for an accounting of all monies and profits realized by
Defendants as a result of the conduct alleged herein, and awarding Plaintiff her court costs and
attorneys' fees, and granting whatever other relief as the Court finds appropriate.

Dated: March 19, 2021

Respectfully Submitted,

**EVANS & DIXON, L.L.C.**

By: /s/ Brian R. Shank
    Brian R. Shank (#59955MO)
    211 North Broadway, Suite 2500
    St. Louis, MO 63102
    Phone: (314) 621-7755
    Fax: (314) 621-3136
    bshank@evans-dixon.com

    Attorneys for Plaintiff
    Rebekah Leitner